Clara SANCHEZ–TRUJILLO, Plaintiff,

v.

The IMMIGRATION AND NATURALIZATION SERVICE OF the UNITED STATES DEPARTMENT OF JUSTICE, and Louis M. Richard, in his Official Capacity as District Director, Defendants.

No. C–C–84–0593–P.

United States District Court, W.D. North Carolina, Charlotte Division.

April 21, 1986.

---

Robert Alan Donat, Charlotte, N.C., for plaintiff.

Charles R. Brewer, U.S. Atty., Charles R. Jonas, Charlotte, N.C., for defendants.

## MEMORANDUM AND ORDER

ROBERT D. POTTER, Chief Judge.

THIS MATTER was heard before the undersigned on March 19, 1986 at Charlotte, North Carolina. The Plaintiff was represented by Robert Alan Donat, Attorney at Law. Terry C. Bird, District Counsel for the Immigration and Naturalization Service, and Charles E. Lyons, Assistant United States Attorney, appeared on behalf of the Defendants.

In its Order filed March 17, 1986, this Court directed the Clerk to enter the default of the Defendants for their failure to file an Answer to the Plaintiff's Amended Complaint within the time allowed by the Court. Since the Defendants in this case are agents of the United States, however, the Court declined to enter judgment by default without having heard the Plaintiff's evidence on the merits of her claim. A claimant may not obtain a default judgment against the United States unless he establishes his claim or right to relief by evidence satisfactory to the Court. Fed.R. Civ.P. 55(e). The Plaintiff, therefore, presented her case to the Court at the hearing on March 19, 1986.

After carefully considering the evidence presented, the Court enters the following Findings of Fact and Conclusions of Law:

(1) The Plaintiff, Clara Sanchez-Trujillo, is a citizen of Colombia currently residing in the United States.

(2) The Defendant, the Immigration and Naturalization Service ("INS"), is an agen-

cy of the United States Department of Justice responsible for the administration of United States immigration laws.

(3) The Defendant, Louis M. Richard, is the District Director of District # 26 of the INS.

(4) The Plaintiff was born on December 3, 1960 in Medellin, Colombia.

(5) The Plaintiff's mother, Lucidia Trujillo Cartagena, and her father, Fernando Antonio Sanchez-Ceballos ("Sanchez"), were never married.

(6) On June 17, 1963, Sanchez was admitted to the United States as a lawful permanent resident. He established his residence in California.

(7) Sanchez returned to Colombia to visit the Plaintiff in 1966, 1969, and 1972. The Plaintiff lived with her father at his request and with the consent of her mother at her paternal grandparents' home during his visit from November 1972 to August 1973.

(8) The Plaintiff testified that her mother and father went to a public notary during his 1972 visit and signed a statement acknowledging that they were her legitimate parents. She further testified that her father's name had been placed on her civil birth certificate by the time he left Colombia in 1973.

(9) During each of his visits, Sanchez expressed a desire to take the Plaintiff back to the United States with him. The Plaintiff's mother, however, felt that she was too young to leave Colombia. She finally consented to allowing the Plaintiff to join her father in the United States when she reached the age of sixteen.

(10) In 1976, Sanchez telephoned the Plaintiff in Colombia and expressed his intention to bring her to the United States. Following that conversation, the Plaintiff obtained certified copies of her civil birth certificate, her church birth certificate, and an affidavit from her mother. She sent all three documents to her father at his request at the end of 1976. The contents of the documents were, of course, written in Spanish.

(11) The civil birth certificate recites the Plaintiff's date and place of birth, her gender, and her name, Sanchez Trujillo Clara Maria. *See* Plaintiff's Exhibit 12. Both of her parents' surnames appear in her name on the certificate. The Plaintiff explained that the custom in Colombia is for the father's surname to appear first and the mother's surname to appear second in a child's name. If a child does not legally have her father's name, however, only her mother's surname will appear in her name. Therefore, the fact that the Plaintiff's father's surname appears on her birth certificate shows that her father indeed did acknowledge her as his child. The significance of the appearance of her father's name on her birth certificate is clarified by the addition of the notation, "The registered person is the daughter acknowledged by Mr. Fernando Antonio Sanchez and of Mrs. Lucidia Trujillo," to her birth certificate in 1983. The notation that the inscription was done in December 1972 bolsters the Plaintiff's testimony that her parents formally acknowledged her during Sanchez' 1972 visit. *See* Plaintiff's Exhibit 4.

(12) The church birth certificate, Plaintiff's Exhibit 11, recites the date that the Plaintiff was baptized in the church, her Christian name (*i.e.*, Clara Maria), and that she is the daughter of Fernando Sanchez and Lucidia Trujillo. It also identifies her paternal and maternal grandparents.

(13) The affidavit submitted by the Plaintiff's mother declares that she is the mother of the Plaintiff and that the Plaintiff had always been under the guardianship of her father. The Plaintiff testified that her father paid for her school, that he had sent her money, and that he had held her out as his daughter whenever he came to Colombia.

(14) On November 30, 1976, Sanchez filed an Application for Verification of Lawful Permanent Residence of an Alien (Form I–550) with the INS. *See* Plaintiff's Exhibit 1. Sanchez stated on that form that the Plaintiff was his "daughter," "il-,

legitimated child," and that she was "recognized by father."

(15) On January 3, 1977, Sanchez filed a Petition to Classify Status of Alien Relative for Issuance of Immigrant Visa (Form I-130) with the INS on behalf of the Plaintiff. *See* Plaintiff's Exhibit 2. On the face of that form, Sanchez directed the INS to the Form I-550 that he had filed earlier. The Defendants' attorney stated at the hearing that the Plaintiff's civil birth certificate and two other documents (presumably the other two documents mentioned above that the Plaintiff had sent to her father) accompanied the petition. No English translations of those documents were submitted, however.

(16) On March 23, 1977, the INS returned the petition and its supporting documents to the Plaintiff's father attached to INS Form I-72. *See* Plaintiff's Exhibit 3. On that form, the INS explained to Sanchez that if he had never been married to the Plaintiff's mother, he would not be eligible to file a petition in her behalf. It further stated that "[a]n illegitimate child does not recieve [sic] any benefits from its father under Immigration Law." The INS marked the box on the form directing the Plaintiff's father to "[f]urnish the marriage certificate of Fernando and Lucidia Trujillo." It did not mark the box next to the instruction that "[a]ll foreign language documents must be accompanied by English translations thereof ...."

(17) Sanchez attempted again to file the Form I-130 with its supporting documents with the INS.

(18) On April 29, 1977, the INS sent another Form I-72 to Sanchez' last known address, in which the INS stated:

Section 101(b)(1)(D) defines an "illegitimate child" in regard to eligibility to receive immigration benefits as a child "by, through whom, or on whose behalf a status, privilege, or benefit is sought by virtue of the relationship of the child to its *natural mother.*" 8 C.F.R. 204.-2(c)(5) also requires that a petition by a father for a child be accompanied by a marriage certificate of the father or stepfather to the natural mother of the child.

Since you have not established that the beneficiary is the legitimate child and no benefits can be bestowed on an illegitimate child by a father, the visa petition is hereby rejected. Plaintiff's Exhibit 3A. This second notice was returned to the INS by the Post Office.

(19) The INS did not ever notify Sanchez of any appeal rights he might have.

(20) The Plaintiff testified that in June or July of 1977 she received a letter from the INS which stated that her father's petition had been denied because he never married her mother and she was an illegitimate child. She stated that she did not consider pursuing the matter any further in 1977 since her parents had never married.

(21) In August 1982, the Plaintiff arrived in the United States on a tourist visa with her boyfriend. An attorney advised her that her father was indeed eligible to file a visa petition in her behalf if she was his legitimated daughter, notwithstanding the fact that he had never married her mother. She went to visit her father in California in 1982, and she asked him to go back to the INS to pursue the visa petition for her once again.

(22) Sanchez had been suffering from acute schizophrenia for a number of years, however, and was quite ill at the time the Plaintiff went to see him in California. He did not return to the INS as a result of his severe depression, and eventually committed suicide in 1983.

(23) The Plaintiff requested an extension of her visa from the INS so that she could help administer her father's estate and consult with an attorney regarding her immigration status. The INS denied her request on January 6, 1984. *See* Plaintiff's Affidavit.

(24) The Plaintiff voluntarily submitted herself to the INS for processing for deportation since she was not granted a visa extension. On April 17, 1984, the Plaintiff was found deportable and was granted voluntary departure in lieu of deportation until August 1, 1984.

(25) On July 27, 1984, the Plaintiff filed with the INS a Motion to reconsider the I–130 petition previously filed by her father and denied. In addition, the Plaintiff requested an extension of her voluntary departure date until the INS decided her Motion to reconsider.

(26) Although the INS denied the Plaintiff's request for an extension of her voluntary departure, this Court granted her Motion for a preliminary injunction. The injunction issued by the Court on December 6, 1984 prevented the INS from enforcing the Plaintiff's departure until a final decision was made by the INS on her Motion to reconsider.

(27) On January 7, 1985, Defendant Richard notified the Plaintiff's attorney that her Motion to reconsider had been denied and that her voluntary departure date was being extended to January 31, 1985.

(28) On March 15, 1985, the Court allowed the Plaintiff to file an Amended Complaint seeking review of the Defendants' rejection of Sanchez' visa petition in her behalf.

(29) The Plaintiff alleges that she was legitimated under the law of her residence (Colombia) and/or her father's residence (California) before her eighteenth birthday and while she was in the custody of her father.

(30) She further asserts that the INS knew or should have known when her father filed the petition that she was the legitimated child of Fernando Antonio Sanchez-Ceballos.

(31) The Plaintiff alleges that her father would have pursued the visa petition, thus paving the way for her to apply to have her status adjusted to that of a permanent resident, if the INS had not misinformed him as to the supposed marriage requirement for legitimation, if the INS had not failed to inform him of a right to appeal the denial of his petition, and if her father had not been ill.

(32) The Plaintiff requests that:

(a) the Court declare her father's I–130 petition approved as of the date it was filed;

(b) she be given the priority date for a visa that she would have gotten had her father's petition been approved at the time it was filed;

(c) she be allowed to adjust her immigration status to that of a permanent resident;

(d) her voluntary departure date be extended until this Court renders a decision on the merits of her case;

(e) if this Court rules against the Plaintiff, her voluntary departure date be set at thirty days after that decision; and

(f) the costs of this action, including attorney's fees, be taxed to the Defendants.

(33) The Court informed the Plaintiff at the hearing that her voluntary departure date would be extended until the Court rendered a decision on the merits of her case.

## CONCLUSIONS OF LAW

(1) The Court has jurisdiction over this case pursuant to 5 U.S.C. § 702 *et seq.*

(2) A federal district court may reverse a denial by the INS of a petition for preferential immigrant visa status only if the INS abused its discretion. *North American Industries, Inc. v. Feldman,* 722 F.2d 893 (1st Cir.1983); *Mila v. District Director,* 678 F.2d 123 (10th Cir.1982), *cert. denied,* 459 U.S. 1104, 103 S.Ct. 726, 74 L.Ed.2d 952 (1983). The Court may find an abuse of discretion "if there is no evidence to support the decision or if the decision is based on an improper understanding of the law." *Kaliski v. District Director of Immigration and Naturalization Service,* 620 F.2d 214, 216 n. 1 (9th Cir.1980).

(3) The Immigration and Naturalization Act provides that second preference for the availability of immigrant visas shall be given to "qualified immigrants who are the spouses, unmarried sons or unmarried daughters of an alien lawfully admitted for permanent residence." 8 U.S.C. § 1153(a)(2).

■ (4) To qualify as an unmarried son or daughter under 8 U.S.C. § 1153(a)(2), an immigrant must first qualify as a "child" under 8 U.S.C. § 1101(b)(1)(C). *See Kaliski, supra,* at 215; *Nazareno v. Attorney General,* 512 F.2d 936 (2d Cir.), *cert. denied,* 423 U.S. 832, 96 S.Ct. 53, 46 L.Ed.2d 49 (1975). Pursuant to § 1101(b)(1)(C), a "child" is

(1) an unmarried person under twenty-one years of age who is—

(C) a child legitimated under the law of the child's residence or domicile, or under the law of the father's residence or domicile, whether in or outside the United States, if such legitimation takes place before the child reaches the age of eighteen years and the child is in the legal custody of the legitimating parent or parents at the time of such legitimation.

8 U.S.C. § 1101(b)(1)(C).

(5) At the time the Plaintiff's father filed his I-130 petition on behalf of the Plaintiff with the INS, he was a resident of California. The law of California in effect at that time regarding legitimation was the Uniform Parentage Act, California Civil Code § 7000 *et seq.,* which provides:

(a) A man is presumed to be the natural father of a child if he meets the conditions as set forth ... in any of the following subdivisions:

. . . .

(4) He receives the child into his home and openly holds out the child as his natural child.

California Civil Code § 7004(a)(4).

■ (6) The Plaintiff was legitimated by her father under California law before she reached the age of eighteen when he took her into his home with his parents in Colombia from November 1972 to August 1973 and held her out as his daughter. It does not matter that the legitimating acts occurred outside of California, since her father reestablished California as his domicile when he returned to the United States. *Kaliski, supra,* at 216.

(7) Colombian Law No. 45 of February 21, 1936 governed the legitimation of children born out of marriage in Colombia, the Plaintiff's residence, at the time her father filed the I-130 petition. According to an opinion prepared by the Hispanic Law Division of the Library of Congress,

[t]he basic provisions of this law state that a child born to parents who at the time of his or her conception were not married to each other is a natural child when he or she has been acknowledged or declared as such according to the law.

. . . .

The acknowledgment of natural children is irrevocable and can be made: 1) in the child's birth records by the parent who acknowledges him or her by signing the records, [or] 2) in a public, i.e., notarial instrument .... (art. 2).

A. Gonzalez, Hispanic Law Division Report on Colombian Law on Parentage, p. 1.

■ (8) It is not clear from the face of the copies of Plaintiff's birth certificates that her father actually signed the Plaintiff's birth records. The notation on the 1983 copy of the Plaintiff's civil birth certificate that the inscription registering her birth had been made on December 29, 1972, however, supports the Plaintiff's testimony that her father had gone before a notary public during his 1982 visit and signed a statement acknowledging that the Plaintiff was his daughter. Thus, the Court finds that the Plaintiff was legally acknowledged by her father according to Colombian law while she was in her father's custody in 1972.

■ (9) The INS was at least put on notice that the Plaintiff had been recognized or legitimated by her father when he filed the I-130 petition in her behalf. In the petition itself, Sanchez referred the INS to his Form I-550, which stated that the Plaintiff was his "illegitimated" child who was "recognized by father." The Colombian birth certificates contain Sanchez' name, and the church certificate specifically shows that she was baptized as the daughter of Fernando Sanchez. The mother's affidavit further states that the Plaintiff had been under the guardianship of her father. It is true that these documents were not accompanied by certified English

translations as required by 8 C.F.R. § 103.-2(b)(1). The INS, however, did not notify Sanchez of the need to submit translations of his supporting documents, even though it could have done so simply by marking the appropriate instruction on the Form I–72 it sent to him with the rejected petition and documents. *See* Exhibit 3, Instruction # 8. In any event, the INS was on notice of the contents of those documents. In addition, the INS was under a duty to investigate the facts of the case before deciding the fate of the petition. *See* 8 U.S.C. § 1154(b).

■ (10) Clearly, the INS' statement on its Form I–72 to Sanchez that he was not eligible to file a petition in his daughter's behalf if he had never been married to her mother was a misstatement of the law. As long as he had legitimated the Plaintiff under the law of his or her residence before her eighteenth birthday and while she was in his custody, he was eligible to file a petition for preferential visa status on her behalf. The INS' rejection of Sanchez' petition for failure to provide proof that he had been married to the Plaintiff's mother was based on an improper understanding of the law and was, therefore, an abuse of discretion that may be reversed by this Court.

■ (11) The INS' abuse of discretion in denying Sanchez' petition prevented the Plaintiff from proceeding with her plans to apply for adjustment of her status to that of a permanent resident. There is, however, no guarantee that her application would have been granted even if the INS had properly approved Sanchez' visa petition when he filed it. Eligibility to receive an immigrant visa is merely a prerequisite to consideration of an application for adjustment of status by the Attorney General. 8 U.S.C. § 1255(a). As the Sixth Circuit noted in *Chen v. Foley*, 385 F.2d 929 (6th Cir.1967), *cert. denied*, 393 U.S. 838, 89 S.Ct. 115, 21 L.Ed.2d 109 (1968):

> Section 245 [8 U.S.C. § 1255] contains certain objective prerequisites which must be met before the relief afforded by that section is available. Once these conditions are satisfied, then the alien has the burden of persuading the Attor-ney General to exercise his discretion favorably. *Tibke v. Immigration and Naturalization Service*, 335 F.2d 42 (2nd Cir.1964).
>
> Simply because an alien fulfills the preliminary requirements, does not mean that he will automatically be accorded adjustment of status. Because this form of relief circumvents ordinary immigration procedures, it is extraordinary and will be granted only in meritorious cases, and the burden is on the immigrant to prove that his case is meritorious. *Santos v. Immigration and Naturalization Service*, 375 F.2d 262 (9th Cir.1967).

*Id.* at 934.

■ (12) The Court cannot assume that a proper handling of the Plaintiff's father's original petition would have led ultimately to the adjustment of the Plaintiff's status to that of a permanent resident. It merely would have placed her in a position to apply for the adjustment of status. The Court, therefore, will not adjust the Plaintiff's status to that of a permanent resident, but it will allow her to apply for such an adjustment by reversing the INS' rejection of her father's petition.

■ (13) The automatic revocation regulations promulgated pursuant to 8 U.S.C. § 1155 do not preclude the Court from retroactively approving the visa petition and placing the Plaintiff in a position to apply for an adjustment of her status to that of a permanent resident. Regulation 205.1 states that the death of the petitioner before a decision on the beneficiary's application for adjustment of status becomes final revokes the approval of a relative petition for preferential immigrant status "unless the Attorney General in his discretion determines that for humanitarian reasons revocation would be inappropriate." 8 C.F.R. § 205.1(a)(3). The statute under which that regulation is promulgated provides that the Attorney General may revoke the approval of any petition approved under 8 U.S.C. § 1154 "for what he deems to be good and sufficient cause." 8 U.S.C. § 1155. The Second Circuit has held that this statute "should not be interpreted to

authorize the Attorney General's wooden application of rules for automatic revocation." *Pierno v. Immigration and Naturalization Service*, 397 F.2d 949, 950 (2d Cir.1968).

(14) In *Pierno*, the beneficiary of an approved petition for nonquota status filed by her husband had applied for an adjustment of her status to that of a permanent resident. When her stepson filed an annulment action against her and his father, however, the INS stayed all proceedings in connection with her application for adjustment of status pending the outcome of that action. Six months later the annulment action was dismissed; seven days later, the immigrant's husband died. The INS held that the husband/petitioner's death automatically revoked the approval of the petition for nonquota status, and for that reason alone found that she did not meet the statutory requirements for eligibility for adjustment of status. The Second Circuit noted that "[i]f the proceedings had continued in their normal course, her status would most probably have been adjusted before her husband's untimely death." *Id.* at 951. It found in essence that an alien should not be penalized as the result of interrupting events unrelated to the normal investigation process and remanded her cause to the INS for further proceedings not inconsistent with its opinion. *Id.*

(15) In the present case, the "normal course" for obtaining status as a permanent resident was thrown off by the INS' misstatement of the law to the Plaintiff and her father. The petition was originally filed January 3, 1977, and the Plaintiff's father did not die until June 18, 1983. If the INS had properly processed Sanchez' petition, she no doubt would have obtained a decision from the INS on an application for adjustment of status before her father's death six years later. Her father's death, therefore, would not appear to be "good and sufficient cause," 8 U.S.C. § 1155, for revoking approval of the petition. Accordingly, the automatic revocation provisions should not bar the Plaintiff's application for adjustment of her status to that of a permanent resident.

(16) The Court will allow the Plaintiff to remain in the United States pending the outcome of her application for adjustment of status.

(17) The Court will not tax the costs of this action or attorney's fees to the Defendants.

(18) Any finding of fact which is determined also to be a conclusion of law is so deemed, and any conclusion of law which is determined also to be a finding of fact is so deemed.

Based on the foregoing Findings of Fact and Conclusions of Law, IT IS, HEREBY, ORDERED that:

(1) The I–130 petition filed by the Plaintiff's father with the INS is retroactively approved as of March 23, 1977, the date on which the Immigration and Naturalization Service initially rejected it;

(2) The Plaintiff is given the priority date for a visa that she would have gotten had her father's I–130 petition been approved on March 23, 1977;

(3) The Plaintiff is allowed to file an application with the INS for adjustment of her status to that of a permanent resident;

(4) The Plaintiff is allowed to remain in the United States pending the outcome of her application to adjust her status;

(5) The parties will pay their own costs, including attorney's fees; and

(6) Default Judgment against the Defendants will be entered in accordance with this Memorandum and Order.